54 CCPA

**Application of Kurt BAUM.**
**Patent Appeal No. 7787.**

United States Court of Customs
and Patent Appeals.
April 6, 1967.
Rehearing Denied June 22, 1967.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., Harold L. Jenkins, Washington, D. C. (James E. Toomey, Oakland, Cal., Bruno J. Verbeck, Chicago, Ill., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection on prior art of claims 1, 3, 6 and 7 of appellant's reissue application [1] for "Recovery of Combustible Gases in Ferro-Metallurgical Processes." Claims 4 and 5 were allowed by the examiner. The board reversed the examiner's rejection of claim 2.

Appellant's specification states, in material substance, that in metallurgical processes wherein ferrous metal is refined in a converter by being contacted at high temperatures with an oxygen-containing gas stream, the object of the present invention is to provide a process and apparatus, in the interest of simplification and economy, for the recovery of combustible converter gases by lowering and controlling their temperatures before they leave the converter. It is asserted that this object is accomplished by the admission of a cool inert gas into the hot gases from the converter during the refining process at a location considerably above the bath level, so that the hot reaction gases mix with the inert gas and are cooled by it as they proceed to a discharge duct. In an at-

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 295,288, filed July 10, 1963, for reissue of patent No. 3,084,039, granted April 2, 1963, on an application filed January 12, 1959.

tempt to reduce converter gas temperature, some prior systems discharged the gases from the converter after the air had been cut off. Appellant states that, with his improved process, he may withdraw the reaction gases continuously during the blow.

The specification states that:

A suitable apparatus [depicted below] for carrying out the process of the invention comprises a hood adapted to be placed in an airtight manner over the converter mouth, this hood having an inlet for the admission of nitrogen or other inert gas, an outlet for the gas mixture to be recovered, and a feeder pipe extending downwardly into the converter for supplying free oxygen to the bath. * * *

While the apparatus employed by appellant in the operation of his claimed process is not in issue, we deem it conducive to a better understanding of said process to reproduce his figure 1 below:

Fig. 1

Hood 3 is provided with an inlet port 12 with conduit 13 for admission of an inert cooling gas, with valve 6 for control of the gas flow. Converter 1 receives oxygen through tube 7, centrally depending from the top of hood 3 and terminating a short distance above the level 2 of the melt. An outlet for converter gases, shown at the top of hood 3 above inlet 12, opens into flue 14 from which duct 15 leads to a purification device. Damper 16 in flue 14 enables gases to be selectively discharged into the atmosphere or delivered to the storage tank. Vent 10, normally closed by lid 17, facilitates introduction of fluxes into the bath. Sight glasses 18 are provided in hood 3. Elements 19 and 20 are inlet and outlet tubes for the circulation of cooling water through the walls of the hood.

Claim 1, which we have chosen to intersperse with letters of the alphabet, reads as follows:

(a) A process of refining a molten ferrous metal bath in a converter which is in association with a hood positioned above said converter,

(b) said hood being provided with a discharge outlet and wherein said converter, the top surface of said bath and said hood define a chamber, comprising the steps of

(c) top blowing the surface of said bath with a stream of free oxygen-containing gas and, simultaneously with said blowing, passing cool inert gas into said chamber

(d) in such a manner that said inert gas mixes with any other gas present in the chamber,

(e) continuing the passage of said inert gas into said chamber during said blowing operation to lower the temperature of the waste gases resulting from the refining reactions to below 1000° C,

(f) passing said cooled waste gases through said discharge outlet

(g) and cleaning said gases to recover carbon monoxide gas.

Claim 3, depending from claim 1, recites that "waste gases are cooled to a temperature below 800° C."

Claim 6, additionally to claim 1, calls for "passing cool inert gas into said chamber at a point above the exit end of the oxygen tube * * *."

Claim 7 does not recite a specific temperature but additionally calls for passing cool inert gas into the chamber "in such a manner to first scavenge said chamber to remove any explosive gas mixture therefrom and then to mix with the refining gases rich in carbon monoxide present in said chamber to substantially lower the temperature thereof * * *."

The only reference before us is:

German patent 1,020,355 December 5, 1957

(hereinafter German)

German discloses that:

It is known to refine steel in the converter by blowing air, oxygen or oxygen-enriched air from *above upon or into the bath*. The disagreeable attendant phenomenon of strong dust development connected therewith, especially of the red-colored dust clouds, is also known.

It has already been suggested to utilize the heat of the hot converter waste gases for steam generation.

* * *

The invention relates to a device which intercepts the converter fumes with dust and waste gases directly above the converter opening and discharges them into a dust bag. According to the invention, wherein a steam generator is placed in the path of the converter gases, a waste-heat boiler is arranged close above the converter. For this purpose the discharge tube near the converter mouth is surrounded by a closed water jacket, and means are provided for blowing the generated steam into the hot waste gases. The main portion of the generated steam is guided in such a manner that the discharged converter gas

and the dust are blown into a dust bag with the aid of the steam. [Emphasis ours.]

For the reason hereinabove given for appellant's drawing, we reproduce below the drawing of the German apparatus.

Stationary waste-heat boiler 2 is arranged above converter opening 3. Interposed therebetween is movable connecting piece 8. Converter-waste-gas feed pipe 1 is also the flue of boiler 2. Gases coming from below (from converter opening 3) pass through feed pipe 1 into dust bag 4. It is stated that:

On this path they give off a portion of their heat to the water of the steam boiler, thereby generate steam, which passes at low pressure, that is, at a

temperature of somewhat over 100°C, through a pipe 5 and an exhaust pipe 6, into the hot gas, cools and moistens it and prepares it for a following purification process.

The generated steam is also fed to gap 7 through flexible pipe 9 and serves to seal off this gap located between converter opening 3 and connecting piece 8. Steam passes into the hot gas at 12.

The examiner rejected the appealed claims as unpatentable over the German patent. Applying the terms of claim 1 to the German disclosure, the examiner noted that German

* * * discloses a process of refining a molten ferrous metal bath in a converter having an opening 3 which is in association with a hood in the form of a coupling 8 and a boiler 2 positioned above the converter. The hood * * * is provided with a discharge outlet leading to dust collector 4 for the purpose of removing dust particles from the gases. The converter, the top surface of the molten metal bath in the converter (not shown, but which obviously must be present) and the hood define a chamber. In the patent, the surface of the molten bath is top blown with a stream of free oxygen containing gas and simultaneously with the blowing, cool inert gas (steam) is passed into the chamber through nozzle 6. * * *

The examiner pointed out that steam would also enter the chamber through opening 7 in coupling 8; that the steam entering the chamber through nozzle 6 and opening 7 would mix with other gases in the chamber; and that this introduction of steam into the chamber in the German patent is continued throughout the blowing operation for the stated purpose of cooling the waste gases and removing such gases from the chamber.

With reference to lowering the temperature of waste gases to below 1000°C., called for in claim 1, the examiner observed that it would appear obvious to cool the waste gases of German to any desired temperature, and further, that appellant's specification contained nothing to indicate that the temperature of 1000° C. is in any way critical and this temperature could not, therefore, confer patentability upon the claim. In this connection, it is pertinent to point out here that the board not only found that the temperature limitation is not described in the specification as being critical but also observed that "the sworn basis for the filing of this reissue application is appellant's assertion that the 1000° C. temperature is *not* critical." (Emphasis board's.) Further, in this connection it is noted that appellant's counsel in oral argument before us stated that the temperature limitation "is not critical."

The examiner rejected claims 3, 6 and 7 for substantially the same reasons stated in his rejection of claim 1.

The board sustained the rejection of the appealed claims as being unpatentable over German "because we are convinced that the process of these claims would have been, at the least, obvious to a person of ordinary skill in the art from the reference," agreeing with the examiner that the claims refer to a continuing operation and do not distinguish from the operation of the German apparatus and noting that "the reference is dedicated to the same purpose of cooling effluent gases that appellant's process serves and, presumably, would have similar optimum exit temperatures * *."

█ The issue here, as we view the record, arises within the contemplation of 35 U.S.C. § 103. We must determine, therefore, whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

█ Appellant argues that a patentable distinction between his claimed proc-

ess and that of the reference resides in the fact that his converter gases are cooled "right from the beginning of the blow" while the German process has a built-in delay in steam generation, thus precluding cooling of the initial surges of hot converter gases coming from the converter as the oxygen hits the molten metal. We find no requirement in appellant's claims that the converter gases be cooled "right from the start of the operation." We note that each claim recites "blowing the surface of said bath with a stream of free oxygen-containing gas" and "simultaneously with said blowing, passing cool inert gas into said chamber." This is not tantamount to a requirement that the flow of inert gas into the chamber start at the same time as the flow of oxygen. The broadest reasonable construction, we think, is that at some time period during the process of refinement there must be a simultaneous flow of inert gas and oxygen into the chamber. There is no requirement in any language of the claims as to when the flow of inert gas begins or ends, and there is no disclosure in appellant's specification of any criticality in starting the flow of inert gas at exactly the same time that the flow of oxygen is started. It is clear that one cannot establish patentability on the basis of a feature that he argues but which does not appear in his specification, drawings, or claims. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

Appellant argues that the *concept* of top blowing the surface of a molten metal bath with a stream of oxygen and *simultaneously* passing cool inert gas into the chamber "is absent in the German patent." It is manifest that the objective of the German patent is to cool and moisten the converter gas containing "red-colored dust clouds" produced by "blowing air, oxygen or oxygen-enriched air from above upon or into the bath." In pursuit of this objective, the patent teaches means for blowing generated steam into the hot waste gases *at the same time* these gases are produced. It would seem, therefore, contrary to

appellant's assertion, that the patent teaches blowing oxygen and passing cool inert gas into the converter chamber *simultaneously*. It is equally clear that the stated objectives of the claimed invention and the reference are the same, with both embracing the same basic concept. We think it is also clear that the limitation in claim 7 "to first scavenge said chamber to remove any explosive gas mixture therefrom" is rendered obvious by the German patent wherein the "steam is guided in such a manner that the discharged converter gas and the dust are blown into a dust bag with the aid of the steam." We construe this to be a purging or scavenging action wherein whatever gas mixture is present in the chamber when the steam is admitted would be expelled first.

Appellant refers in his brief to the German patent as a foreign publication which "is a valid reference only for what is clearly disclosed therein." We evaluate and apply the teachings of all relevant references on the basis of what they reasonably disclose and suggest to one skilled in the art, without regard to whether their origin is foreign or domestic in a national sense. In re Kalter, 316 F.2d 747, 50 CCPA 1191, citing In re Moreton, 288 F.2d 708, 48 CCPA 875.

Upon consideration of the record, the briefs, and arguments of counsel, we find no reversible error in the decision of the board, which is accordingly affirmed.

Affirmed.

SMITH, Judge (concurring).

The record shows that the Board of Appeals here consisted of an examiner-in-chief and two acting examiners-in-chief. Appellants do not challenge the legality of that board. For the reasons expressed in my dissenting opinion in In re Wiechert, 370 F.2d 927, 54 CCPA ——, the decision of such a board in my view is a legal nullity. However, I must accept the majority's view on this issue

in the *Wiechert* case, i. e., the legality of the board is not an issue here. I therefore participate in the merits of this appeal and in so doing, agree with the conclusion of the majority.